**AMERICAN NAT. BANK OF SAPUL-PA, OKL., v. BARTLETT.**

**No. 163.**

Circuit Court of Appeals, Tenth Circuit.
April 7, 1930.

Glenn O. Young and Ernest B. Hughes, both of Sapulpa, Okl. (Edwin A. Ellinghausen, of Sapulpa, Okl., on the brief), for appellant.

Henry L. Fist, of Tulsa, Okl. (Chas. L. Yancey, of Tulsa, Okl., and Clarence L. Westcott, of New York City, on the brief), for appellee.

Before LEWIS, COTTERAL, and McDERMOTT, Circuit Judges.

McDERMOTT, Circuit Judge.

This appeal presents the question of the power of a managing agent of a retail store to execute a mortgage on the furniture, fixtures, and equipment of the store, to secure a pre-existing indebtedness. The referee and trial court held he was without such power; and, while the question of authority of an agent is ordinarily one of fact (21 R. C. L. 856), and while the findings of a referee in bankruptcy, approved by the trial court, will not be disturbed, unless clearly against the weight of the evidence (In re Ben Boldt, Jr., Floral Co. (10 C. C. A.) 37 F. (2d) 499), the facts herein are not in substantial dispute, and the real question is the conclusion to be drawn therefrom. Such a situation presents a question of law. Weicker v. Bromfield (10 C. C. A.) 34 F.(2d) 377; Panama R. Co. v. Beckford (5 C. C. A.) 231 F. 436; Munro v. Smith (1 C. C. A.) 259 F. 1; Flad v. Murphysboro & S. I. Ry. Co. (7 C. C. A.) 283 F. 386; 4 C. J. 882. "The facts admitted and the concessions made by the parties may be considered with the findings of fact made by the district court." Reading Steel Casting Co. v. United States, 268 U. S. 186, 188, 45 S. Ct. 469, 69 L. Ed. 907.

The bankrupt is a corporation which owned and operated a retail store at Sapulpa, Okl. Its name was Kaufman & Mayer at the time the mortgage was given, but was later changed to Mayer's, Incorporated. Ferd Kaufman and Max Mayer owned practically all of the stock; Mayer owning substantially more than Kaufman. Mayer was president, lived in St. Louis, Mo., and made three or four trips a year to Sapulpa. Kaufman was secretary and the resident general manager, and had been for many years. He bought merchandise, equipment for the store, hired and fired the help, and borrowed money from the bank. He had authority "to do whatever was necessary to keep the business going." Years before, Kaufman, with the consent of Mayer, purchased new fixtures, the seller retaining a purchase-money lien for part of the purchase price. Kaufman, likewise with the consent of Mayer, had purchased a bookkeeping machine on a conditional sales contract. The appellant knew of Mayer's interest in the business. The directors of the corporation met at intervals and functioned as such. The by-laws and minutes confer no authority upon any one to execute mortgages.

For a long while prior to January 21, 1928, the bank had held the corporation's note for $10,000, signed by Kaufman as secretary, and personally indorsed by Mr. Mayer and Mr. Kaufman. The bank had never before had a mortgage from Kaufman & Mayer. On January 21, 1928, the note became due; the bank said it could not renew it without a mortgage on the furniture and fixtures. Kaufman did not execute the mortgage, but said he would "have to take it up with Mr. Mayer." The bank acquiesced and took a new note due April 20. On February 23, 1928, Kaufman executed the mortgage in question to secure the note given in January and due in April. It was signed "Kaufman & Mayer, Ferd Kaufman, Secy." Kaufman did not take it up with Mayer, or anybody else, nor did he thereafter tell any one he had executed it. The referee reluctantly found the mortgage was promptly recorded; although our decision turns on other grounds, we are not satisfied that it was recorded. The original mortgage has never been found; a carbon copy was found in the recording office of the county, bearing a half number, the only instance disclosed by the evidence of half numbering in that office. The loss of the original, and the giving to the carbon copy a half number between two consecutive numbers of the date of February 25, is a strange coincidence at best. There are other peculiar circumstances. Kaufman sold his interest to Mayer on February 28, and retired from the business, and Mayer took personal charge. The cashier of the bank testified that thereafter, and after the bank claims to have had and recorded the mortgage, he asked Mayer for a mortgage on the same property to se-

cure the same note, and admits he did not tell Mayer he already had the one now in suit. Mayer declined, saying it would be commercial suicide. The cashier's concealment of the fact of the giving of the mortgage, the unexplained disappearance of the original, the production of a carbon copy with a half number with its inference of "dating back," are difficult to reconcile with the finding reluctantly made by the referee. But, passing that, it appears that the corporation paid the interest and $3,000 on the principal of the note, without knowledge of the existence of the mortgage. In September, bankruptcy intervened; the bank claimed security under the mortgage; the trustee in bankruptcy exercising the "powers which [the bankrupt] might have exercised for his own benefit" (Act of July 1, 1908, § 70a(3), 11 USCA § 110(a)(3), repudiated the mortgage. The referee and trial court allowed the note as a general claim, but disallowed the lien of the mortgage. The correctness of that ruling is the principal question in the case.

■ From this statement, it is apparent that no question of ratification in fact, or of ratification by voluntary retention of the benefits of an agent's unauthorized act, is present; and this for the reason that neither the corporation nor Mr. Mayer had any knowledge of the execution of the mortgage prior to the bankruptcy. Full knowledge of the unauthorized act, and of all material matters related to it, is an essential of a valid ratification. Restatement of the Law of Agency, Tent. Draft, §§ 120 and 128; Owings v. Hull, 9 Pet. 607, 9 L. Ed. 246; Bloomfield v. Charter Oak Nat. Bank, 121 U. S. 121, 7 S. Ct. 865, 30 L. Ed. 923; Bell v. Cunningham, 3 Pet. 69, 7 L. Ed. 606. Neither do we have the case of a "one-man" corporation, the board of directors of which has abdicated, as in some of the cases cited. There were two men who were substantially interested in the corporation, and the board of directors did function. We come, then, to the question of the power of Kaufman to execute this mortgage.

■■ 1. The underlying rule of the law of agency is that "The party dealing with the agent * * * must be able to trace the authority on which he relies back to some word or deed of the principal." Mechem on Agency (2d Ed.) §§ 210, 750. Declarations of the agent, not in the presence of the principal, as to the existence or extent of his authority, are not admissible. Atlas Land Co. v. Hendriks (8 C. C. A.) 298 F. 589; Deming Ladies' Hospital Ass'n v. Price (8

C. C. A.) 276 F. 668; Gratz v. McKee (8 C. C. A.) 9 F.(2d) 593, cert. denied, 270 U. S. 664, 46 S. Ct. 472, 70 L. Ed. 788; Durant Motor Co. of New Jersey v. Georgia-Florida Motor Co. (5 C. C. A.) 18 F.(2d) 95; Manjon v. Lebron (1 C. C. A.) 23 F.(2d) 266.

2. It is conceded that no express authority to execute this mortgage had been conferred upon Kaufman either by the corporation or his associate in interest, Mr. Mayer.

■ 3. Authority, not expressly given, may arise as a necessary implication from the authority that is expressly granted. The law implies that the agent is authorized "to do all of the incidental and subordinate acts which are reasonably necessary and proper to carry into effect the main authority conferred, or which are usually and ordinarily done as a part of the main act." Restatement of the Law of Agency, Tent. Draft No. 1, § 43; Mechem on Agency (2d Ed.) § 715; National Bank of Republic v. Old Town Bank (7 C. C. A.) 112 F. 726.

■ The appellant claims that the authority to manage the store, "to do whatever was necessary to keep the business going," carries with it, by implication, the authority to mortgage the properties of the corporation. To this we cannot assent. It cannot be said, as a matter of fact, that managers of stores ordinarily have or exercise the authority to mortgage the furniture and fixtures without which the store could not function. Kaufman's authority was "to keep the business going." A mortgage on fixtures is the first step toward stopping the business; ordinarily it is, as Mr. Mayer said when he declined to give one, "commercial suicide." It is a step of such serious and far-reaching possibilities that it should be taken by the directors or the stockholders, and not by a resident manager. And so runs the law. In Wells & Co. v. Sharp (8 C. C. A.) 208 F. 393, 398, the facts were that the president, who was also the active general manager, executed, over the corporate seal, a chattel mortgage on two movable elevators of the corporation. There was no express authority. The court held the authority was not implied from his powers as president or general manager. The court said:

"The mortgaging of property to secure a past-due indebtedness is certainly not an act done in the usual course of current business. It is a first step to what generally terminates in bankruptcy and destruction of the business. We cannot give our assent to the exercise of such potentially destructive power by a chief executive officer of a business cor-

poration without authority of the board of directors or stockholders themselves."

The same court, in Chicago, R. I. & P. Ry. Co. v. Chickasha Nat. Bank, 174 F. 923 (Van Devanter, Carland, and Pollock concurring) held that the power of a resident general agent did not embrace the power to pledge property of the principal, unless "the very nature of the business to be transacted by the agent must require the exercise of such extraordinary authority, and this is true whether the agency be general or special." And to the effect that the power to run a business does not imply the power to dispose of it, see Lanahan v. Clark Car Co. (3 C. C. A.) 11 F.(2d) 820, 824.

Mechem, in his work on Agency (2d Ed.) § 1004, cites many authorities to sustain his statement that:

"An agent authorized to manage and carry on his principal's business has thereby no implied authority to pledge or mortgage the property in his possession. As is tersely said by a learned judge: 'It is not carrying on the business of the company to pledge or mortgage the machinery used by the company and thereby suspend its operations; or place them at the will and pleasure of a mortgagee.'"

Thompson, in his work on Corporations (3d Ed.) § 1692, in a chapter dealing with the powers of a general manager, states:

"Another important limitation is that a manager employed in the operation of the business can not pledge or sell the property or machinery essential to the operation of the business. The plain reason of this rule is that it is not carrying on the business of the corporation to pledge or mortgage the machinery and thereby suspend its operations."

Corpus Juris states that the authority to mortgage "is rarely to be inferred, and ordinarily will not be implied from general authority to manage, or even to sell, the property of the principal." 2 C. J. 650. And in 21 R. C. L. p. 867, the rule is stated that: "Nor does the authority of an agent to carry on the business of a manufacturing company extend to the right to pledge or mortgage its machinery and buildings."

In the Restatement of the Law of Agency, by the American Law Institute, the rule is laid down that an agent duly authorized to "manage a business or enterprise" may not "sell, lease, mortgage, pledge or assign the business or enterprise, or department thereof." Section 358, Tent. Draft No. 3.

We conclude that a resident general manager, authorized to run a business, has no implied authority to mortgage the equipment, furniture, and fixtures of the corporation.

 4. A principal may have so conducted himself that an agent has the *power* to bind him, without having *authority,* either express or implied, so to do. Mechem on Agency (2d Ed.) § 712. Although this is a power, as distinguished from authority, it is commonly called "apparent authority." From the very nature of the rule, it is only available to those who have relied upon the appearance of authority. "Inasmuch as the whole doctrine of powers by estoppel rests upon the theory that the other party has been led to rely upon appearances to his threatened detriment, it is obvious that the doctrine can apply only in those cases in which this element of reliance was present." Mechem on Agency (2d Ed.) § 724.

Williston, in his work on Contracts (volume 1, § 277), under the heading "Apparent Authority and Estoppel," says:

"An agent may be able to make contracts which will bind his principal not only when actually authorized by express words or implication of fact to do so but also in cases where the principal did not intend to confer such authority on the agent but, nevertheless, held out to the public or to the person with whom the agent dealt an appearance of authority. If one with whom the agent dealt justifiably believed the agent was authorized, and if the facts justifying that belief were due to the conduct of the supposed principal, the latter will be bound."

 In Jenson v. Toltec Ranch Co. (8 C. C. A.) 174 F. 86, 89, Judge Sanborn held that a corporation which had, by its acts, created an appearance of authority which did not in fact exist, was "estopped from denying, to the prejudice or injury of those who have acted in reliance upon his apparent authority, that he had actual authority to do acts of a similar nature on its behalf. Martin v. Webb, 110 U. S. 7, 3 S. Ct. 428, 28 L. Ed. 49; G. V. B. Mining Company v. First Nat. Bank, 95 F. 23, 30, 36 C. C. A. 633, 640." To the same effect see Globe & Rutgers Fire Ins. Co. v. McGinnis (9 C. C. A.) 29 F.(2d) 357; 2 C. J. 465. Without exploring the limits of the rule, it is sufficient to say that its basis is estoppel; its reason is, that the courts protect those who have reasonably relied upon an agent having such authority as the principal has held him out as having. A third party who is advised that the agent does

not have the power exercised cannot rely upon apparent authority.

In this case there was no showing of express authority in the agent to borrow money. But for years he had exercised that power; the corporation knew he was doing it, accepted the benefit of his acts, and paid interest and principal on notes he had executed. Having permitted the agent to exercise that power for years, the corporation cannot now be heard to say, to one who relied upon his apparent authority, that the agent was not authorized. Hence the corporation in this case is bound by the note executed by Kaufman to the bank. It is argued that the authority to mortgage should be implied from the apparent authority to borrow money. It is true that an apparent authority, like an actual one, carries with it the implied authority to do the incidental and subordinate acts reasonably or ordinarily necessary to execute the apparent authority. But the ordinary power of a store manager to borrow money does not carry with it the extraordinary power of mortgaging the properties necessary to operate the store. Nor is the appearance of such power created by an isolated instance of the retention by the seller of a purchase money lien, years before, when the fixtures were purchased; nor from the buying of a bookkeeping machine, or a typewriter, on a conditional sales contract.

Moreover, the facts here foreclose the appellant from invoking the doctrine of apparent authority. The cashier of the bank testified that, when he asked for a mortgage, Kaufman, the manager, said "he would have to take it up with Mr. Mayer"; that is, Kaufman advised the bank he had no authority to execute a mortgage. Under such circumstances, under the authorities above cited, there can be no talk of reliance upon an authority which the bank was advised the agent did not have. At the very least, the bank was not justified in reliance upon Kaufman's act without ascertaining that Mr. Mayer consented.

We conclude that the decision of the trial court allowing the note as an unsecured claim is correct.

5. The note provides that, "if this note should be placed in the hands of an attorney, we, or either of us agree to pay $1,000.00 attorney's fees and all other costs of collection." Under the Oklahoma decisions a stipulated attorney's fee is "within the equitable control of the court, and he should allow only such sum as may be reasonable." State v.

Chastain, 132 Okl. 44, 269 P. 319; McClain v. Continental Supply Co., 66 Okl. 225, 168 P. 815. Such is the rule in the federal courts. Mechanics'-American Nat. Bank v. Coleman (8 C. C. A.) 204 F. 25, and cases therein cited. But in bankruptcy, only such claims are provable as are "a fixed liability * * * absolutely owing at the time of the filing of the petition against him, whether then payable or not. * * *" Act of July 1, 1898, § 63 (11 USCA § 103). In First Savings Bank & Trust Co. v. Stuppi (8 C. C. A.) 2 F.(2d) 822, this section and its applicability to stipulations for attorneys' fees is considered, and the conclusion reached that the reasonable value of the services of an attorney rendered prior to the filing of the bankruptcy petition is a provable claim; that services rendered thereafter are not. This conclusion is supported by many decisions, and we are in accord therewith. The decision of the referee, adopted by the trial court, denying the claim for the stipulated attorney's fee, but granting leave to prove the value of legal services rendered prior to the date of the filing of the petition in bankruptcy, is correct.

The orders of the trial court are, in all respects, affirmed.