Caryl ADAMS, Individually and as Trustee of the V.M. Johnson 1962 Trust, Plaintiff-Appellee,

v.

PAINE, WEBBER, JACKSON & CURTIS, INC., a corporation, and Lawrence Ocrant, Defendants-Appellants.

No. 80CA1226.

Colorado Court of Appeals, Div. II.

Dec. 8, 1983.

Rehearing Denied Jan. 12, 1984.

Certiorari Granted Aug. 7, 1984.

Roath & Brega, P.C., Charles F. Brega, J. Stephen McGuire, Stuart N. Bennett, Denver, for plaintiff-appellee.

Fairfield & Woods, Charles E. Matheson, Denver, for defendants-appellants.

Williams, Trine, Greenstein & Griffith, P.C., J. Conard Metcalf, Boulder, amicus curiae.

PIERCE, Judge.

In this action for breach of fiduciary duty, defendants, Paine, Webber, Jackson & Curtis, Inc., a corporation, and Lawrence Ocrant (collectively "broker"), appeal a judgment entered on a jury verdict in favor of plaintiff, Caryl Adams (customer), individually and as trustee of the V.M. Johnson 1962 Trust. We affirm.

Customer filed this action alleging broker had breached fiduciary duties owed to her, and had negligently inflicted emotional distress on her because of outrageous conduct. Customer sought compensatory damages for losses suffered because of excessive trading and unsuitable investments, and profits made by broker on such trading. She also prayed for damages for emotional distress and punitive damages.

The gravamen of customer's complaint was that broker had breached its fiduciary duties through excessive and unsuitable trading in two brokerage accounts during the mid-1970's. She alleged her business naivete and financial unsophistication, along with her reliance upon, and trust and confidence in, broker.

Broker countered these allegations by denying customer's asserted naivete and

unsophistication, and further defended by asserting customer had ratified or acquiesced to the very acts she contested. Alternatively, broker asserted that customer had waived all rights to complain about the investment results because of her awareness of the events themselves.

The jury returned a general verdict for customer on her claim of breach of fiduciary duties, compensating her both as an individual and as trustee for losses suffered, and awarded punitive damages. It returned a verdict for broker on the outrageous conduct claim.

Customer is in her mid-forties with no background in corporate finance, accounting, or bookkeeping. Customer's first husband had some sophistication as to investments.

The parties here agree that the events pertinent on appeal may be broken into three distinct time periods. First, there is that period beginning in August 1973 and ending December 1974 (first period); next, is that period beginning in December 1974 and continuing through December 1975 (second period); and, December 1975 through August 1976 constitutes the final period (third period).

During the first period, customer's first husband dealt with broker concerning investments and trades to be made in and for an account husband set up in customer's name, without her knowledge, with stock owned individually by her. Because there were outstanding loans against the stocks which were paid off by broker, a certain number of these stocks became subject to a security interest in broker. First husband also set up a cash account with broker for the V.M. Johnson Trust, of which he and customer had been previously named co-trustees.

During this sixteen month period, customer was completely unaware of there being an account in her name. Until December 1974, she received neither communications nor confirmation slips from broker concerning this account; first husband dealt with broker on customer's behalf without customer's knowledge. The single event triggering a personal meeting between customer and broker's representative was the dissolution of her marriage to first husband in December 1974.

During this period broker bought and sold millions of dollars worth of securities in 29 transactions.

The second period begins with the personal meeting between customer and broker's representative. During this meeting, first husband indicated customer would thereafter make all investment decisions concerning her account. Customer then received information concerning her account and husband's previous activities, for the first time, from broker's representative.

Throughout December 1974 through 1975, broker's representative engendered customer's reliance and growing trust and confidence in him and in his counsel through his attentions and personal interest in customer.

He maintained close personal and social contacts with customer, her children, and her mother, and introduced customer to male friends, including the man who became customer's second husband. During this second period of time and thereafter, he took over almost complete control of the accounts and convinced customer the trust account should be traded on margin, as was the other account. He made untrue statements to members of the family that they were becoming extremely rich from the accounts.

Both accounts were "turned over," *i.e.*, the stock was sold and replaced, several times each year. For example, the children's account was turned over more than 17 times during the third period. The sums of money which accrued to broker in commissions, interest, and portfolio costs far exceeded the bounds of reason.

The third period of time started with customer's second marriage in September 1975. The marriage lasted approximately nine months. During the period of this relationship, customer continued to rely on broker's representative for personal solace

and advice. She eventually retained counsel to represent her in the dissolution proceedings, and was advised to freeze trading in both accounts. This she did in August 1976. Customer closed both accounts in April 1977. The above facts more than justify the rulings of the trial court and the eventual verdict of the jury as to liability.

## I.

The trial court instructed the jury that, as a matter of law, a fiduciary relationship between broker and customer did exist during the second and third periods of time. The court's instruction further stated, however, that the jury was not to be influenced by this direction in determining whether a fiduciary relationship existed between broker and customer during the first period. Hence, appropriate instructions defining a fiduciary relationship and the duties inherent within such a relationship were also given to the jury concerning the first period of time. *See Colo.J.I.* 31:16 (2d ed. 1980).

Broker now contends that the trial court committed reversible error when it instructed the jury that a fiduciary relationship existed between broker and customer from December 1974 through August 1976. We disagree.

■ By statute, a "fiduciary" is defined as including a "trustee under any trust ... agent ... or *any person acting in a fiduciary capacity for any person,* trust, or estate." Section 15–1–103(2), C.R.S. 1973. When acting within a fiduciary capacity, a person fills an office of trust and is held to the high standard of duty required by a trustee. *Hudson v. American Founders Life Insurance Co.,* 151 Colo. 54, 377 P.2d 391 (1962); *see also Roth v. Roth,* 571 S.W.2d 659 (Mo.App.1978).

■ The existence of a fiduciary relationship between a customer and a stockbroker is a question of fact, and the burden of establishing its existence is upon the party asserting its existence, here, the customer. *Tschudy v. Sudler,* 158 Colo. 421, 407 P.2d 877 (1965). However, neither the factors comprising a fiduciary relationship between a stockbroker and a customer, nor the test to be applied, have been specifically addressed in this jurisdiction.

We are aware that many jurisdictions apply a *per se* rule which holds that when the professional relationship itself is established between broker and customer, a fiduciary relationship is established as well, as a matter of law. *See e.g., Twomey v. Mitchum, Jones, & Templeton,* 262 Cal. App.2d 690, 69 Cal.Rptr. 222 (1968); *Roth v. Roth, supra.* In light of the *Tschudy* decision, however, that rule cannot be applied in this jurisdiction. We believe the appropriate rule to be the "trust and confidence" rule which has been adopted by many federal jurisdictions.

■ This rule reflects an awareness that investment banking is a business based principally on the foundation of confidence. *Hughes v. Securities & Exchange Commission,* 139 F.2d 434 (2d Cir.1943). Under this theory, an agency analysis is applied to stockbroker-customer relationships, and in determining whether a fiduciary relationship exists between broker and customer, a court is to look for trust and confidence, either given by a customer to a broker, or induced from a customer by a broker. *Stevens v. Abbott, Proctor & Paine,* 288 F.Supp. 836 (E.D.Va.1968); *Hecht v. Harris, Upham & Co.,* 283 F.Supp. 417 (N.D. Cal.1968); *S. Goldberg, Fraudulent Broker-Dealer Practices* §§ 8.0–8.5 (1978); *see Restatement (Second) of Agency* §§ 13(b) and (c) (1958). We therefore rule that if the facts show that the relationship between stockbroker and customer is accompanied by proof of the customer's trust and confidence in the broker, a fiduciary relationship is created. *See generally S. Goldberg, Fraudulent Broker-Dealer Practices* § 8.4 (1978).

■ Here, the trial court did not err when it took the factual determination from the jury as to the last two periods of time involved. Indeed, the evidence of customer's trust and confidence reposed in broker, and the breach of that trust, was

overwhelming. *See Breeden v. Dailey*, 40 Colo.App. 70, 574 P.2d 508 (1977).

Fully documented evidence, some of which is set forth above, demonstrates that these two accounts had been subject to excessive trading and investment in low grade securities which, given customer's investment objectives and financial condition, was unsuitable. It was further demonstrated that these practices had been employed in a shocking manner during each period of time in question, and that broker had blatantly used the established personal relationship with the customer to foster her confidence in broker, even as broker was securing great financial gain to customer's financial loss. Therefore, we find no reversible error on this ground.

## II.

Broker also asserts the trial court erred in its instructions on the affirmative defenses of ratification, waiver, and estoppel. Specifically, broker asserts the trial court erred when it instructed the jury that for it to find in favor of broker on the question of breach of fiduciary duty, it had to find the customer had actual and full knowledge of those facts concerning the transactions in question. Broker argues that actual knowledge is not a requirement for any of the defenses asserted. We disagree.

 Full knowledge is essential before a party is held to have ratified the acts of his agent. Absent knowledge of material facts, ratification is not possible. *Chicago Title Insurance Co. v. Progressive Housing Co.*, 453 F.Supp. 1103 (D.Colo.1978). Implied ratification may take place only when the principal has full knowledge of all circumstances surrounding the transaction. *Film Enterprises, Inc. v. Selected Pictures, Inc.*, 138 Colo. 468, 335 P.2d 260 (1959).

 For an individual to have waived his rights the individual must have had full knowledge of the facts concerning such waiver. *Obodov v. Foster*, 105 Colo. 254, 97 P.2d 426 (1939). Further, an effective waiver requires voluntary action based upon knowledge of the consequences. *Weck v. District Court*, 158 Colo. 521, 408 P.2d 987 (1965).

 In the same vein, since it was shown that neither customer nor her first husband was an experienced investor, and that they did not have any knowledge of the improper actions of the broker, estoppel is not applicable to the situation. *Landry v. Hemphill, Noyes & Co.*, 473 F.2d 365 (1st Cir.1973); *see Manor Vail Condominium Ass'n v. Vail*, 199 Colo. 62, 604 P.2d 1168 (1980). Thus, the trial court here submitted proper instructions on the affirmative defenses to the jury.

## III.

 Broker next claims that a portion of the instruction concerning the measure of damages to be applied was incorrect. We disagree.

As part of its instructions regarding compensatory damages, the trial court allowed the jury to consider "any profit that would have occurred in the value of plaintiff's securities if there had been no breach of fiduciary duty."

This portion of the instruction was taken directly from *Hudson v. American Founders Life Insurance Co., supra*. Although the *Hudson* case cited a rule applicable where corporate directors or officers had been found to have breached a fiduciary duty, the element of lost profits is also applicable if a breach of trust has been proven in a situation in which a stockbroker owes a fiduciary duty to a customer. *See Restatement (Second) of Trusts*, § 205. Here, there was extensive evidence presented the jury as to the amount of lost profits and how they could be calculated. This evidence nullified the broker's claim that such damages, if granted, would be speculative. Therefore, lost profits were a proper element of damages to be considered in this case.

## IV.

Broker's only challenge to customer's claim for exemplary damages is that this

claim should have been dismissed by the trial court because it is barred by the statute of limitations set out in § 13–80–104, C.R.S.1973, which governs this claim. We disagree.

Section 13–80–104, C.R.S.1973, provides as follows:

"All actions and suits for any penalty or forfeiture of any penal statute, brought by this state or any person to whom the penalty or forfeiture is given, in whole or in part, shall be commenced within one year after the offense is committed and not after that time."

Customer's claim for exemplary damages was premised on § 13–21–102, C.R.S.1973, which states:

"In all civil actions in which damages are assessed by a jury for a wrong done to the person, or to personal or real property, and the injury complained of is attended by circumstances of fraud, malice or insult, or a wanton and reckless disregard of the injured party's rights and feelings, the jury, in addition to the actual damages sustained by such party, may award him reasonable exemplary damages."

In *Harding Glass Co. v. Jones*, 640 P.2d 1123 (Colo.1982), our Supreme Court held that § 13–21–102, C.R.S.1973, does not create a separate legal right. This statute applies only where a civil wrong has been attended by aggravated circumstances, and it has no application in the absence of a successful underlying claim for actual damages. Therefore, where a complaint prays for both actual and exemplary damages, a single claim for relief is stated. *Harding Glass Co., Inc. v. Jones, supra.*

Here, customer prayed for exemplary damages attendant to the wrongs committed by broker when it breached its fiduciary duties. The exemplary damages claim is not separate from customer's claim for compensatory damages for breach of fiduciary duty, but rather sets forth a single claim for relief.

The question is whether customer's claim for exemplary damages, premised on § 13–21–102, C.R.S.1973, concerns an action for a penalty or forfeiture. We hold that it does not. *Jones v. Harding Glass Co., Inc., supra; see also Resource Exploration & Mining, Inc. v. ITEL Corp.*, 492 F.Supp. 515 (D.Colo.1980). Customer's claim for exemplary damages was dependent upon the underlying action for breach of fiduciary duty. The nature of the right sued upon and not the form of the action or the relief demanded is determinative of the applicability of the statute of limitations. Thus, because § 13–80–104, C.R.S.1973, is inapplicable as a bar, broker's argument must fail.

We have examined the other allegations of error and find them to be without merit.

The judgment is affirmed.

VAN CISE and TURSI, JJ., concur.